UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO. 6:21-CR-00176-01** |
| **VERSUS** | **CHIEF JUDGE S. MAURICE HICKS, JR.** |
| **MORRIS JAMES (01)** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

### REPORT AND RECOMMENDATION

Before the Court is Defendant's Motion to Suppress. (Rec. Doc. 35). The Government opposed the Motion (Rec. Doc. 42), and Defendant replied (Rec. Doc. 45). The Motion was referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of this Court. An evidentiary hearing was held on December 13, 2022. (Rec. Doc. 65). Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, the Court recommends that Defendant's Motion be denied.

### Factual Background

Defendant was indicted on July 21, 2021, with one count of possession with intent to distribute a controlled dangerous substance, specifically cocaine. (Rec. Doc. 2). He appeared and was arraigned on August 27, 2021. (Rec. Doc. 13). He filed the

instant motion to suppress on November 18, 2021, seeking to exclude evidence seized during a traffic stop on June 22, 2021.

Cpl. Mike Milazzo with the Lafayette Police Department testified that on June 22, 2021, he was working on patrol in the criminal interdiction unit. (Rec. Doc. 65, p. 8-9). Between approximately 2:00 and 2:30 a.m., as he was parked perpendicular to eastbound Interstate 10, his headlights were on, with no other lights or signals engaged. Upon observing Defendant's vehicle approach while driving in the left/passing lane approximately a quarter of a mile or more away, Cpl. Milazzo pulled onto the interstate behind Defendant. (Rec. Doc. 65, p. 10-12). After Defendant remained in the left/passing lane for approximately 30 seconds, Cpl. Milazzo engaged his blue lights and pulled Defendant over for driving in the left/passing lane when not passing. Cpl. Milazzo's dash camera corroborated his testimony. (Rec. Doc. 64; Exhibit 1 – Video Dash Camera; Rec. Doc. 65, p. 14-16).

Once Defendant pulled over, Cpl. Milazzo approached the car and asked for his driver's license and from where Defendant had come. Defendant responded that he had been in Lake Charles visiting his "baby mama." Cpl. Milazzo further inquired about new clothing with tags he observed in the Defendant's back seat. Defendant responded that he had been to the dry cleaners. (Rec. Doc. 64; Exhibit 2 – Body Camera; Rec. Doc. 65, p. 20-21).

Having returned to his unit to run Defendant's license and information checks, Cpl. Milazzo discovered that, contrary to Defendant's statement, Defendant had actually come from the Jefferson County area of Texas, as revealed by the license plate recognition system (LPR).[1] (Rec. Doc. 65, p. 19-23). Cpl. Milazzo did not testify regarding the results of his criminal background check other than to state that Defendant did not have any warrants in the Lafayette area (Rec. Doc. 65, p. 47); however, Cpl. Milazzo's body camera recorded his review of the results as they appeared during his computer check. He discovered that Defendant had at least two convictions for possession of cocaine, with periods of parole, as well as an "extensive dope history." (Rec. Doc. 64; Exhibit 2 – Body Camera at 2:21 through 2:22). Either Cpl. Milazzo or an assisting officer on the scene also noted possible "dope residue," but Cpl. Milazzo later testified that he could not confirm whether he saw such residue and therefor did not use this observation as a basis to search. (Rec. Doc. 65, p. 60). Cpl. Milazzo then instructed Defendant to get out of the car and again asked Defendant about his travel itinerary. Defendant denied having been in Texas. In response to Cpl. Milazzo's request, Defendant consented to a search of his vehicle. The search revealed over a kilo of cocaine in a duffel bag in the trunk. (Rec.

---

[1] Cpl. Milazzo testified that prior to the stop he had information from the LPR system that Defendant's vehicle had come from Texas; however, at the time he pulled Defendant over, he had not matched Defendant's vehicle to the information in the system. (Rec. Doc. 65, p. 17-19).

3

Doc. 65, p. 24-25; Rec. Doc. 64; Exhibit 2 – Body Camera). Defendant now challenges the search on the grounds that the initial stop was unjustified and that the officer's use of the LPR system constituted an unconstitutional search.

## Law and Analysis

Defendant's Motion to Suppress invokes the exclusionary rule, as it seeks to preclude the Government from introducing at trial certain evidence, specifically the cocaine uncovered in the search of Defendant's vehicle and any statement made by the Defendant during the stop. "The exclusionary rule was created by the Supreme Court to 'supplement the bare text' of the Fourth Amendment, which 'protects the right to be free from 'unreasonable searches and seizures,' but ... is silent about how this right is to be enforced.'" *United States v. Ganzer*, 922 F.3d 579, 584 (5th Cir.), *cert. denied,* 140 S. Ct. 276 (2019), citing *Davis v. United States*, 564 U.S. 229, 231 (2011). The exclusionary rule operates to exclude the prosecution from introducing evidence obtained unconstitutionally. *Id*. Its purpose is to deter officer misconduct, not to redress injury to the victim of a constitutional violation or to address judicial errors or misconduct. *Id*., citing *Davis v. United States*, 564 U.S. 229, 236-37 (2011), and *United States v. Leon*, 468 U.S. 897, 916 (1984).

Generally, "the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). In cases

4

such as this, where the officer acted without a warrant, the Government bears the burden of proof. *Id; United States v. Castro*, 166 F.3d 728, 733, fn. 6 (5th Cir. 1999).

Defendant seeks suppression of the evidence seized during his traffic stop on the grounds that 1) his initial traffic stop was unwarranted; 2) the traffic stop was unreasonably extended in scope; and 3) the use of the LPR system was an unconstitutional search pursuant to *U.S. v. Carpenter*, 138 S.Ct. 2206 (2018).

### I. <u>Whether the initial traffic stop was justified.</u>

In a case involving a traffic stop the Fifth Circuit set forth the applicable law as follows:

> The reasonableness of traffic stops and investigative detentions of persons suspected of criminal activity is evaluated through a two-step inquiry under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Stevens,* 487 F.3d 232, 244 (5th Cir.2007). First, we determine whether stopping the vehicle was initially justified by reasonable suspicion. Second, we evaluate whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. In the context of a traffic stop, once an officer's initial suspicions "have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Estrada,* 459 F.3d 627, 631 (5th Cir.2006).

*United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013).

Applying the foregoing two-step analysis, the Court must first determine whether the initial stop was justified by reasonable suspicion. If Defendant did not, in fact, commit a traffic offense, the stop was unjustified. *United States v. Cole*, 444 F.3d 688, 690 (5th Cir. 2006).

Cpl. Milazzo testified that he pulled Defendant over for driving in the left/passing lane in violation of Louisiana revised statute 32:71, which forbids driving in the left lane except to pass. He further testified that at the time of the traffic stop, signs indicating that drivers were not to drive in the left/passing lane except to pass were posted nearby.

Cpl. Milazzo testified that he first observed Defendant's vehicle approaching in the left/passing lane approximately a quarter of a mile away. He did not see any vehicles in the right lane. Upon pulling onto the interstate behind Defendant, he followed the vehicle for approximately 30 seconds to give Defendant time to get into the right lane, but Defendant remained in the left/passing lane though there were no other vehicles in the right lane. (See generally Rec. Doc. 65, p. 11-16).

Defendant testified that he only got into the left/passing lane upon seeing Cpl. Milazzo's unit parked on the side of the road, relying on La. R.S. 32:125(B). (Rec. Doc. 65, p. 92-94). That statute provides that drivers shall move to the left lane of a two-lane roadway upon approaching "any vehicle making use of any visual signals as authorized by law, including the display of alternately flashing green, amber, or yellow warning lights, is parked on or near the highway." The evidence shows that Cpl. Milazzo's unit was not displaying any visual signals, such as flashing lights. The Court does not interpret La. R.S. 32:125(B) to include basic headlights as "visual signals authorized by law." In any event, the Court finds that Cpl. Milazzo

6

was justified in initiating a traffic stop for Defendant's driving in the left/passing lane when no other vehicles were in the right lane. Although the dash camera video shows an 18-wheeler in the right lane prior to the stop, the video confirms that Defendant had ample time to get into the right lane after the truck passed and before Cpl. Milazzo pulled him over. The Court found Cpl. Milazzo's testimony credible and is further persuaded by the video evidence which shows that Cpl. Milazzo followed Defendant in the left/passing lane for approximately 30 seconds, with no other vehicles in the right lane, before pulling Defendant over. See also Cpl. Milazzo's testimony regarding the extra time he gave Defendant to get into the right lane. (Rec. Doc. 65, p. 44). Thus, the Court finds the initial traffic stop was warranted.

## II. Whether the officer's search was reasonably related in scope to the traffic stop.

Having found that the initial stop was justified by reasonable suspicion, the Court must determine whether the officer's actions were reasonably related in scope to the circumstances justifying the stop. A traffic stop based on reasonable suspicion that the defendant has violated a traffic law "cannot continue for an excessive period of time or resemble a traditional arrest." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.,* 542 U.S. 177, 185-86 (2004). "[A] traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015),

7

quoting *Illinois v. Caballes,* 543 U.S. 405, 407 (2005). "The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to inspect the driver's license, automobile registration, and proof of automobile insurance; run computer checks; determine whether there are outstanding warrants against the driver; and ask the purpose and itinerary of the trip." *United States v. Spears*, 636 F. App'x 893, 901 (5th Cir. 2016), citing *Rodriguez,* 135 S.Ct. at 1615 and *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of rehearing*, 622 F.3d 383 (5th Cir. 2010). "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Berry*, 664 F. App'x 413, 418 (5th Cir. 2016), *as revised* (Dec. 14, 2016), quoting *Pack*, 612 F.3d at 350. See also *United States v. Andres,* 703 F.3d 828, 833 (5th Cir.2013).

The Fifth Circuit recently summarized the standard of reasonable suspicion as follows:

> A reasonable suspicion consists of "specific and articulable facts ... taken together with rational inferences from those facts" that reasonably suggest "criminal activity [is] afoot." Although reasonable suspicion cannot consist simply of an officer's hunch that an individual is engaged in illegal activity, only "some minimal level of objective justification" is required. In our review, we must consider the "totality of the circumstances" that confronted the law enforcement officer. Observations that by themselves are susceptible to innocent

8

> explanations, when taken together, can still amount to reasonable suspicion. "In considering whether officers reasonably suspect someone of criminal activity, we defer to their law enforcement experience, recognizing that trained officers may draw inferences from certain facts 'that might well elude an untrained person.'"

*United States v. Burgos-Coronado*, 970 F.3d 613, 619 (5th Cir. 2020) (citations omitted).

Cpl. Milazzo testified that he became suspicious while running his computer checks, during which he discovered from the LPR system that Defendant had come from Jefferson County, Texas, contrary to Defendant's statement that he had come from Lake Charles. (Rec. Doc. 65, p. 19-21; 24). As a criminal interdiction officer with nearly nineteen years of experience, Cpl. Milazzo knew that drug traffickers often use the Interstate 10 corridor to traffic narcotics from the south Texas area, which he referred to as a "hot spot" or "source city." (Rec. Doc. 65, p. 110-11; 119-20). He also knew that Defendant had an extensive narcotics criminal history, was driving a rental car and that he had brand new clothes with tags in the back, which Defendant claimed had come from the dry cleaners. (Rec. Doc. 65, p. 20-24; see also Rec. Doc. 64; Exhibit 2 – Body Camera). The video evidence shows that approximately ten (10) minutes elapsed from the time Cpl. Milazzo initiated the stop to the time Defendant consented to a search. Of that time, eight (8) minutes elapsed between the stop's initiation and Cpl. Milazzo's completion of the computer checks. (Rec. Doc. 64; Exhibit 2 – Body Camera).

The Court finds that Cpl. Milazzo had sufficient reasonable suspicion to detain Defendant and request consent to search and that the traffic stop was not unreasonably prolonged. See e.g. *United States v. Gomez*, 444 F. Supp. 3d 739, 744 (M.D. La. 2020), *aff'd,* 855 F. App'x 989 (5th Cir. 2021) ("Defendant's inconsistent answers, including the uncertainty as to details of his travel plans, [the passenger's] inconsistent answers, Defendant's previous arrests, and the use of a rental car are actions consistent with the conduct of a drug courier, thereby providing reasonable suspicion to justify the extension of the traffic stop."); *United States v. Smith*, No. 6:20-CR-00246-01, 2022 WL 16570060, at *4 (W.D. La. Sept. 30, 2022), *report and recommendation adopted*, No. 6:20-CR-00246-01, 2022 WL 16558734 (W.D. La. Oct. 31, 2022) (Prolonged detention justified where the defendant had lied about his rental agreement and his itinerary, he had driven from the Beaumont, Texas area, a narcotics source city, and he had a narcotics trafficking criminal history.); *United States v. Young*, 816 F. App'x 993, 996 (5th Cir. 2020) (Prolonged detention justified based on the defendant's inconsistent statement regarding itinerary, nervous behavior, and a criminal history involving narcotics.).

### III. Whether use of the LPR system violates the Fourth Amendment.

Defendant challenges Cpl. Milazzo's use of the LPR system to determine that he had come from Texas as an unconstitutional search. Defendant analogizes the use

of the LPR database to the use of historical cell-site location information (CLSI), Regarding such challenges, the Fifth Circuit explained as follows:

> The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The basic purpose of the Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. It protects against government intrusion into areas where people have reasonable expectations of privacy. Where the government seeks to intrude upon such private spheres, it generally needs a warrant supported by probable cause.

*United States v. Beverly,* 943 F.3d 225, 232 (5th Cir. 2019) (cleaned up; citations omitted).

Defendant relies principally upon *Carpenter v. U.S.* wherein the Supreme Court held that collection of CSLI from a third-party cellular service provider constitutes an invasion of privacy which requires a search warrant supported by probable cause. *Carpenter v. United States*, 201 L. Ed. 2d 507, 138 S. Ct. 2206 (2018). The Court distinguished two divergent lines of precedent: one in which an individual has a reasonable expectation of privacy in his physical location and movement, citing *U.S. v. Jones*, in which the Court held that installation of a GPS tracker on a vehicle is an invasion of privacy requiring a search warrant. *Id*., citing *United States v. Jones,* 565 U.S. 400, 405 132 S.Ct. 945 (2012). In the alternative precedent, the *Carpenter* Court drew "a line between what a person keeps to himself and what he shares with others." *Id*. at 2216. Generally, under the third-party

11

doctrine, an individual has no legitimate expectation of privacy in information he voluntarily turns over to third-parties. *Id*. The Court considered CSLI tracking as more akin to the former line of cases, analogizing the technology to the GPS tracking in *Jones*, because both were "detailed, encyclopedic, and effortlessly compiled." *Id*. The Court further distinguished the ability to track CSLI as particularly unique:

> In fact, historical cell-site records present even greater privacy concerns than the GPS monitoring of a vehicle we considered in *Jones*. Unlike the bugged container in *Knotts* or the car in *Jones,* a cell phone—almost a "feature of human anatomy," *Riley,* 573 U.S., at —— –, 134 S.Ct., at 2484—tracks nearly exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales. See *id.,* at ——, 134 S.Ct., at 2490 (noting that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower"); contrast *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion) ("A car has little capacity for escaping public scrutiny."). Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user.

*Id*.

The Court did not "call into question conventional surveillance techniques and tools, such as security cameras." *Id*. at 2220.

Defendant urges the Court to equate LPR systems to CSLI under *Carpenter* and find that officers' use of the system constitutes an invasion of privacy in violation of the Fourth Amendment. The Government argues LPR systems are no

12

different than an officer, an individual, or even a surveillance camera on the side of the road observing and recording vehicles that pass. The Court agrees that the LPR system fits suitably within the third-party doctrine.

Captain Brad Ridge, LPD services captain, explained at the hearing that the LPR is a system of cameras along various roadways which captures license plates. The cameras capture every license plate that passes,[2] which credentialed law enforcement officers can access for criminal justice purposes. (Rec. Doc. 65, p. 65; 69-72). Cpl. Milazzo testified that he accessed the LPR system that night as part of his criminal interdiction duties, which included recognizing vehicles on the I10 corridor which originated from source cities. The Court finds that Cpl. Milzzo's use of the LPR system was a legitimate criminal justice purpose authorized by LPD policies.

This Court's ruling is in accord with recent jurisprudence throughout the country finding that use of LPR systems does not violate the Fourth Amendment. See e.g. *U.S. v. Bowers*, in which the Western District of Pennsylvania reasoned:

> A search under the Fourth Amendment occurs where a defendant has a subjective expectation of privacy "that society is prepared to recognize as reasonable." *Smith*, 442 U.S. at 740. Supreme Court Fourth Amendment jurisprudence has long recognized that a person traveling in a vehicle on public streets does not have a reasonable expectation of privacy in his movements from place to place. See

---

[2] The officers testified that alerts can be set up in the system to target certain vehicles; however, Defendant's vehicle was not specifically targeted in this case. (Rec. Doc. 65, p. 65; 82-83; 113-14).

> *United States v. Knotts,* 460 U.S. 276, 281-82 (1983). Likewise, the use of a camera to capture a photograph or a video of an object in plain view is not a Fourth Amendment search, even if the object is on private property or the image is enhanced beyond the vision of the naked eye. See, e.g., *Dow Chem. Co. v. United States*, 476 U.S. 227, 238-39 (1986); *California v. Ciraolo*, 476 U.S. 207, 214 (1986). With respect to vehicle information, the Supreme Court has specifically stated that "[t]he exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search'." *New York v. Class*, 475 U.S. 106, 114 (1986).

*United States v. Bowers*, No. 2:18-CR-00292-DWA, 2021 WL 4775977, at *3 (W.D. Pa. Oct. 11, 2021).

Further, "No argument can be made that a motorist seeks to keep the information on his license plate private. The very purpose of a license plate number ... is to provide identifying information to law enforcement and others." *United States v. Ellison*, 462 F.3d 557, 561-62 (6th Cir. 2006). "Similarly, it has been held that the use of cameras for video surveillance of public spaces is not a Fourth Amendment search because individuals do not have a reasonable privacy expectation in such spaces." *Bowers, supra.* See also *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1150-1152 (9th Cir. 2007); *Albert v. Schwartz*, 173 F. App'x 106, 107-08 (3d Cir. 2008).

The Court agrees with the prevailing precedent that LPR systems do not constitute an unconstitutional invasion of privacy. Accordingly, the Court finds Cpl. Milazzo did not violate the Fourth Amendment by utilizing the LPR system. Regardless, based on the existing legal authority on the issue discussed above, Cpl.

Milazzo at least acted in good faith in relying on the LPR system. See *Davis v. United States*, 564 U.S. 229, 241, 131 S. Ct. 2419, 2429 (2011) (The good faith exception to the exclusionary rule applies to an officer's reliance upon legal precedent even if the precedent is subsequently overturned.)

## Conclusion

For the reasons discussed herein, the Court recommends that Defendant's Motion to Suppress (Rec. Doc. 35) be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed. R. Crim. P. 59(b), parties aggrieved by this recommendation have fourteen days after being served with a copy to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Crim. P. 59(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 30th day of January, 2023.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE